**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

**AURELYS ALERS AND WILLIAM VÉLEZ,**

**Plaintiffs,**

**v.**

**DR. JOSÉ A. BARCELÓ, et al.,**

**Defendants.**

**CIVIL NO. 14-1756 (GAG)**

**OPINION AND ORDER**

On October 10, 2014, Aurelys Alers and her husband William Vélez ("Plaintiffs"), brought this suit based on diversity of citizenship against numerous defendants seeking compensation for alleged medical malpractice when Alers underwent surgery at Hospital Pavia. (See Docket Nos. 1; 32.) Defendants are Dr. José A. Barceló ("Dr. Barceló"), the anesthesiologist during the operation; Dr. William Méndez ("Dr. Méndez"), the surgeon in charge of Alers' operation; Metro Santurce, Inc., as the Puerto Rico corporation that owns Pavía Hospital of Santurce ("Hospital Pavía") where the operation took place; and Continental Insurance Company ("Continental Insurance"), as the insurance company that covers Plaintiffs' claims against Hospital Pavía. (See Docket No. 32.)

Presently before the Court is Dr. Barceló's Motion for Summary Judgment pursuant to FED. R. CIV. P. 56 at Docket No. 71 and Dr. Méndez's Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(1) and 12(b)(6) at Docket No. 73.[1] Co-Defendants Continental Insurance Company and

[1] Dr. Barceló filed a Motion for Summary Judgment arguing that this Court "lacks subject matter jurisdiction to entertain" this claim because Plaintiffs are not *bona fide* residents of New York, and in the alternative, the complaint fails to set forth sufficient facts to demonstrate that the amount in controversy exceeds $75,000, as required by 28 U.S.C. § 1332. (Docket No. 71 at 2.) For the same reasons, Dr. Méndez moved the Court to dismiss the complaint under both the 12(b)(1) and the 12(b)(6) standard. (Docket No. 74 at 1.) Because a motion to dismiss under Rule 12(b)(1) is "[t]he proper vehicle for challenging a court's subject-matter jurisdiction," the Court will assess Defendants' motions under the 12(b)(1) standard. Valentin, 254 F.3d at 362.

Hospital Pavía filed separate motions for joinder of the aforementioned dispositive motions. (See Docket Nos. 75; 76.) Plaintiffs replied in opposition. (Docket No. 80). Dr. Méndez responded to Plaintiffs' opposition, and co-Defendants once against filed separate motions for joinder of the response. (Docket Nos. 81-83.) Lastly, Plaintiffs sur-replied.[2] (Docket No. 93-1.)

After reviewing the parties' submissions and pertinent law, the court hereby **DENIES** Defendants' Motion to Dismiss at Docket No. 73; and **DENIES** Defendants' Motion for Summary Judgment at Docket No. 71.

## I. Rule 12(b)(1) Motion to Dismiss Standard

FED. R. CIV. P. 12(b)(1) provides a mechanism for challenging the court's subject matter jurisdiction. See FED. R. CIV. P. 12(b)(1); see also Sumitomo Real Estate Sales, Inc. v. Quantum Dev. Corp., 434 F. Supp. 2d 93, 95 (D.P.R. 2006). The party asserting jurisdiction bears the burden of demonstrating its existence. Skwira v. United States, 344 F.3d 64, 71 (1st Cir. 2003). The First Circuit established the standard district courts must follow when considering a Rule 12(b)(1) motion when defendants challenge the existence of diversity jurisdiction "factually," that is, by "controverting the accuracy (rather than the sufficiency) of the jurisdictional facts asserted by the plaintiff and proffering materials of evidentiary quality in support of that position." Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001). In such cases, "the plaintiff's jurisdictional averments are entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." Id. (citing Garcia v. Copenhaver, Bell & Assoc., 104 F. 3d 1256, 1261 (11th Cir. 1997)). In arming itself to make this

---

[2] At Docket No. 93, Plaintiffs moved for leave to file a Sur-Reply "to address mainly the issue of the 'sham affidavit doctrine' raised by the defendants." (Docket No. 93 at 1.) The same day, this Court granted Plaintiff's Motion for leave to file a sur-reply. (Docket No. 94.) Defendants then filed a Motion to strike Plaintiff's sur-reply, arguing that the Court erred in granting Plaintiffs' Motion for leave to file, because the sur-reply was "not strictly confined to new matters raised in the reply memorandum." (Docket No. 95 at 2.) The Court denied Defendants' Motion to strike Plaintiffs' sur-reply at Docket No. 95, and thus, has considered Plaintiff's sur-reply in evaluating both motions. (See Docket No. 111.)

jurisdictional determination the court is not confined to the four corners of the complaint, and instead, can conduct "discovery, consider extrinsic evidence, or hold evidentiary hearings." Valentin, 254 F.3d at 363.

## II. Relevant Factual Background[3]

When looking at the facts in a 12(b)(1) motion, the court must "choose amongst conflicting inferences, and make credibility judgments." Valentin, 254 F.3d at 365.

Alers has been suffering from thyroid cancer since 2013. (Docket No. 32 ¶ 16.) After a recurrence, she was referred to Dr. Méndez for a surgical procedure known as bilateral neck dissection. Id. The surgery was scheduled for October 14, 2013 at Hospital Pavía. Id. ¶¶ 19; 26. Defendants contend that on the day of the surgery, after putting Alers under anesthesia, she began wheezing and was then treated for a bronchospasm. (Docket No. 72 ¶ 8.) Due to the pulmonary complications, Dr. Barceló and Dr. Méndez decided to cancel the surgery. Id. ¶ 9. Alers was transferred to a recovery room with ventilator support, and eventually taken off the ventilator. Id. ¶ 10. She was then released from Hospital Pavía on October 16, 2013. Id. ¶ 14.

---

[3] As a threshold matter, the Court addresses the admissibility of Plaintiffs' sworn affidavits attached to their Response in Opposition to Motion. (Docket Nos. 80-1; 80-2.) Defendant invokes the "sham affidavit" doctrine and moves to strike both affidavits from the record. (Docket No. 81-1 at 2.) A sham affidavit will only be stricken from the record, if following discovery, a party then uses affidavits to contradict facts previously provided in order to survive summary judgment. Morales v. AC Orssleff's EFTF, 246 F.3d 32, 35 (1st Cir. 2001).

The Court has examined all of the statements contained in both affidavits, and assessed whether any of them contradict prior testimony in order to warrant exclusion from the record. For all but one statement, the Court finds that they provide more details and further explain Plaintiffs' deposition testimony without purposefully controverting that prior testimony. See Malave-Torres v. Cusido, 919 F. Supp. 2d 198, 203 (D.P.R. 2013) (quoting Nelson v. City of Davis, 571 F.3d 924, 928 (9th Cir. 2009)) ("[t]his doctrine excludes conflicting testimony given by an interested party, but does not bar a party from 'elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition.'").

Alers' conclusory statement that she "never had the intention to return to Puerto Rico" could be construed as a contradiction of her deposition testimony where she sometimes hinted that she "wished" she could go back to Puerto Rico. (See Docket Nos. 80-1 ¶ 7; but cf. Docket No. 72-1 at 123.) However, for the reasons explained below (III.A.) this statement had no effect on the Court's analysis. Defendants are reminded that under the 12(b)(1) standard, the Court can "choose amongst conflicting inferences, and make credibility judgments." Valentin, 254 F.3d at 365. Unlike in a motion for summary judgment, a "factual challenge" under a 12(b)(1) motion, does not require the Court to look at the facts in the light most favorable to the non-moving party, or to deny the motion if there are genuine issues of material facts. Thus, at this stage, there are no grounds to exclude said statements. The Court has been able to assess all of the evidence presented, and make credible judgments where needed.

Defendants contend the injury Alers' suffered that day was "self-limited"; that is, limited to an episode of bronchospasm, which was treated within 48 hours. Id. ¶ 15. Alers counters that she felt like she "had been hit in the chest by a bat . . . [and] [e]very movement of her body was extremely painful." (Docket No. 32 ¶ 29.) Alers contends she continued recuperating after release, and she was prescribed new medication to manage the pain from the incident. Id. ¶ 31. The surgery was rescheduled for November, 2013. Id. ¶ 34. Alers alleges because of the incident she had to be examined by an allergist, pneumologist, and an internist. Id. ¶ 33. She also contends she suffered panic attacks that required emergency room treatment because of anxiety about returning to the hospital for another surgery. Id. ¶ 33-34. Alers seeks no less than $500,000 compensating her for physical and emotional suffering, and Vélez seeks no less than $50,000 for emotional suffering. (See Docket No. 32 ¶¶ 46, 47, 53.)

At the time of the incident, Plaintiffs were married and lived in Puerto Rico. (Docket No. 72 ¶ 17.) Alers continued having complications with thyroid cancer, and decided with her husband to move to New York to seek treatment at Memorial Sloan Kettering Cancer Center. (Docket No. 32 ¶ 38.) On February, 2014, Plaintiffs moved to Vélez's uncle's house in Jackson Heights, Queens, New York. (Docket No. 72 ¶ 21.) In order to manage the medical expenses, Plaintiffs obtained New York food stamps, government health care, and Supplemental Security Income (SSI). (Docket No. 72-2 at 50.)

In New York, Plaintiff scheduled an appointment with Doctor Ashok Shaha, a leading researcher of thyroid cancer. (Docket No. 74-1 at 13-15.) Alers saw Dr. Shaha three or four times, but did not receive treatment because Dr. Shaha wanted to consult her case with the Board of Doctors before deciding how to proceed. Id. at 18. During her last appointment at Sloan Kettering on November 2014, Dr. Shaha advised Alers that one of the best doctors in his staff, Dr. Yamil

Castillo, was re-locating to Puerto Rico, and that she could continue treatment in Puerto Rico with him, if she wished. Id. at 20. Plaintiffs then decided to go back to Puerto Rico on December 2014, and to this day, Alers continues treatment with Dr. Castillo. (Docket No. 80-1 ¶ 13.)

On October 10, 2014, at the time Plaintiffs filed the complaint, they claimed to be residents of New York "dedicated to fighting for Aurelys' survival." Id. ¶ 38. Plaintiffs did not register to vote in New York, did not open a bank account or obtain credit cards from a New York bank, did not file income tax returns in New York, and Alers did not get a New York driver's license. (Docket No. 72 ¶¶ 25, 26, 29.) However, Vélez did obtain a New York driver's license; and he sold the car he owned in Puerto Rico. (Docket Nos. 72-1 at 123; 74-1 at 21.) Alers also testified that she looked for scholarships to continue her legal studies in New York. (Docket No. 74-1 at 31.) Plaintiffs kept their Puerto Rico cellphone numbers, but made monthly payments at the T-Mobile store in New York. (Docket No 80-1 ¶ 11.) Vélez worked for a dog-walking business his aunt started, New York Paw Pals, LLC. (Docket Nos. 74-1 at 25; 80-1 ¶ 4.) Plaintiffs did not pay rent, because Alers helped by babysitting Vélez's uncle's children five days a week, in exchange for room and board. (Docket No. 74-1 at 24.)

## III. Discussion

Defendants argue Plaintiffs have failed to show that they were domiciled in New York because Plaintiffs only moved there to seek medical treatment for Alers, and did not renounce their original domicile in Puerto Rico. (Docket Nos. 72-6 at 5; 74 at 8.) Plaintiffs counter that they provided the Court with enough evidence to demonstrate that they moved to New York in order to receive medical treatment, and at the time they filed the suit, it was their intent to remain in New York indefinitely. (Docket No. 80 at 1-2.)

District courts have original jurisdiction over civil suits between citizens of different states where the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332(a)(1). Diversity of citizenship is established as of the time the plaintiff files the suit. Bank One, Texas, N.A. v. Montle, 964 F.2d 48, 49 (1st Cir. 1992). A party who invokes diversity jurisdiction bears the burden of demonstrating complete diversity by a preponderance of the evidence. See Toste Farm Corp. v. Hadbury, Inc., 70 F.3d 640, 642 (1st Cir. 1995); Garcia-Perez v. Santaella, 364 F.3d 348, 350 (1st Cir. 2004).

**A. Diversity of Citizenship**

In establishing diversity jurisdiction, citizenship is looked at in terms of "domicile." Torres-Vazquez v. Com. Union Ins. Co., 417 F. Supp. 2d 227, 233 (D.P.R. 2006) ("[t]hat is to say, a person is considered to be a citizen of the state in which he is domiciled."). Domicile is where a person has a "true, fixed home and principal establishment, and to which, whenever he [or she] is absent, he [or she] had the intention of returning." Id. Two things are required to establish domicile: (1) physical presence, and (2) the intent to remain there indefinitely, or make that place one's home. See id.; see also Kidd v. Hilton of San Juan, Inc., 251 F.Supp. 465, 468 (D.P.R. 1966).

A change of legal domicile could occur instantly, as long as the person intends to make that place his home for the time being. See Hawes v. Club Ecuestre El Comandante, 598 F.2d 698, 701 (1st Cir. 1979) ("[t]here must be an intention to remain at the new residence indefinitely; it is not required that the intention be to stay there permanently. A 'floating intention' to return to a former domicile does not prevent the acquisition of a new domicile."). The reasons that motivate a person to move to a new state are irrelevant, and there is no minimum amount of time that a person must live in a state to establish it as his domicile. Id.

Because there is no question Plaintiffs in this case where present in New York at the time of the suit, the Court will focus on the Plaintiffs' "intent" to remain in New York indefinitely, or make New York their home. In doing so, the court looks at "the totality of the circumstances." Torres-Vazquez, 417 F. Supp. 2d at 234 (D.P.R. 2006); see also Delgado Ortiz v. Irelan, 830 F.Supp. 68, 70 (D.P.R. 1993) ("no single factor is wholly controlling in determining whether diversity exists. Rather, a court must make such determination on a case by case basis."). Some of the factors often considered when determining a party's "domicile" are the state in which a person holds: (1) voting registration; (2) location of real or personal property; (3) rental property; (4) driver's license; (5) bank accounts; (6) church or club membership; (7) where taxes are paid; (8) place of employment; and (9) places of business. See, e.g., Lundquist v. Precision Valley Aviation, 946 F.2d 8, 11 (1st Cir. 1991); Bank One, 964 F.2d at 50.

In the present case, the Court must assess Plaintiffs' intent to remain in New York as of October 10, 2014, the day they filed a complaint in this District Court.

Plaintiffs presented credible evidence that they moved to New York seeking reliable medical treatment for Alers' cancer condition, and it was their intent to remain there indefinitely until her medical situation resolved. They provided evidence that as soon as they moved to New York they obtained medical care from Dr. Shaha, and the Court finds that all the decisions they made as a couple from that point on, revolved around her medical care in New York.[4] There is no evidence that there was any information regarding the time frame of her treatment or when she could expect it to conclude. Additionally, Plaintiffs received local and federal government benefits typical of those given to residents of a state, including New York food stamps, public health

[4] In her deposition, Alers explained several times their intention to remain in New York. For example, when asked about selling the car, Alers asserted that her husband "sold the car [because] [w]e needed the money to be [in New York] since we were not going to return [to Puerto Rico]." (Docket No. 72-1 at 123.) When asked why she needed to stay in New York, Alers responded: "[b]ecause I needed health care insurance that I could trust," until her medical situation was resolved. Id.

insurance, and SSI. (Docket No. 72-2 at 50.) Vélez obtained a driver's license from the state of New York, and worked in a dog-walking business with his aunt in that state. (Docket Nos. 72-1 at 123; 74-1 at 21-25). Alers in essence traded free babysitting services during the week in order to stay in Vélez's uncle's apartment rent-free. (Docket No. 74-1 at 24.)

Defendants argue that Plaintiffs' true domicile was Puerto Rico at the time of filing. Defendants assert that Plaintiffs did not intend to remain in New York indefinitely, because they did not register to vote, did not file taxes, did not change their cellphone numbers, and did not buy property in New York. However, the Court is mindful that no single factor is determinative to establish domicile, and the totality of the circumstances must be taken into account. See Torres-Vazquez, 417 F. Supp. 2d at 234. Here, Plaintiffs provided credible testimony about their precarious economic situation, which prevented them from buying or renting real or personal property. It is credible that Plaintiffs had no means to buy a car, and instead had to rely mostly on New York's public transportation system. Additionally, in this day and age it is not necessary to change cellphone carriers or numbers when moving to another state and Plaintiff testified that she paid their bill at New York T-Mobile shops. (Docket No. 72-1 at 133.)

Defendants' arguments are unconvincing because, while helpful for showing domicile, "superficial" ties such as bank accounts, drivers' licenses and voter registrations, do not, on their own, establish domicile. See León v. Caribbean Hosp. Corp., 848 F. Supp. 317, 318 (D.P.R. 1994). Rather, it is more important to examine if the "bridges to the former domicile [ ] still remain." Id. Defendants argue that because Plaintiffs maintained their bank accounts in Puerto Rico, did not register to vote in New York, and only Vélez obtained a valid license from New York, their true intent was to return to Puerto Rico. However, Plaintiffs explained that because of their economic situation they had to keep their bank accounts in Puerto Rico, so that his parents

could deposit money into their account that Plaintiffs could withdraw in automatic tellers in New York. (Docket No. 72-1 at 120.) Most convincing is the fact that Plaintiffs sold their only asset in Puerto Rico, a car, in order to finance the cost of remaining in New York. Additionally, Vélez moved to New York with his wife, leaving his studies and job in order to attend to her medical needs. Thus, Plaintiffs did not leave any property or meaningful attachments in Puerto Rico that would be "ready and waiting upon [their] return." See León, 848 F. Supp. at 318.

Lastly, Defendants' argument that moving to another state merely to seek medical treatment there does not suffice for diversity purposes is unsupported. (Docket Nos. 74 at 8; 72-6 at 14.) Defendants rely on Valentin, where the First Circuit held that the plaintiff failed to establish Florida as her domicile when she moved there to receive medical treatment, and also stated that she harbored the intention to permanently move to Florida sometime in the future. Valentín, 254 F.3d at 367. In that case, the First Circuit's decision relied on the contention that "[a]n amorphous desire to relocate from one place to another at an indeterminate future date does not suffice to effect a change of domicile." Id. However, in no way did that case establish that relocating for medical purposes precludes establishing that state as a domicile. To the contrary, the First Circuit has held that a change in domicile can occur instantly, and the reasons that motivated the person to move to a new state are irrelevant, as long as the party had the *intention* to remain there for an indefinite amount of time. See Hawes, 598 F.2d at 701 (emphasis added). Furthermore, "[a] 'floating intention' to return to a former domicile does not prevent the acquisition of a new domicile." Id.

Importantly, the Court notes that Plaintiffs filed suit while living in New York before learning of Dr. Castillo's relocation to Puerto Rico. Therefore, the Court finds credible, that at the time of filing, Plaintiffs intended to make New York their home for an indefinite period of time

until her medical condition resolved. Her statements that she "wished" to go back to Puerto Rico at some point in the future do not preclude a finding of diversity.

Thus, the Court finds that Plaintiffs were domiciled in New York on October 10, 2014, the date they filed the suit. As such, the parties are completely diverse because this suit is between citizens of different states.

**B. Amount in Controversy**

Defendants also argue that Plaintiffs' claims do not satisfy the statutory amount in controversy requirement. (Docket Nos. 74 at 11; 72-6 at 17.)

The Supreme Court has made clear that, in determining the amount in controversy, "unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288 (1938). If the damages allegation is challenged, then "the party seeking to invoke jurisdiction has the burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount." Dep't of Recreation and Sports v. World Boxing Ass'n, 942 F.2d 84, 88 (1st Cir. 1991).

In their complaint, Plaintiffs plead with particularity that all the physical and emotional pain they are alleging arose from the surgery that led to this suit. (See Docket 32.) Plaintiffs allege that Alers "nearly die[d] and suffer[ed] great pain from what was done to her on October 14, 2013 and for weeks thereafter." Id. ¶ 46. Additionally, Plaintiffs assert that Alers has "suffered great anxiety when having to go to hospitals for medical treatment." Id. Specifically, Alers felt like she "had been hit in the chest by a bat . . . [and] [e]very movement of her body was extremely painful" after the surgery. (Docket No. 32 ¶ 29.) Alers' recuperation continued after release from the hospital, and she was prescribed new medication to deal with the pain from the incident. Id. ¶

31. These factual allegations are sufficient to establish that Plaintiffs pled the amount in controversy in good faith.

Thus, the Court cannot concluded the Amended Complaint is so clearly lacking as to reflect to a legal certainty that Plaintiffs cannot recover more than $75,000.[5]

## IV. Conclusion

From Plaintiffs' deposition testimony and affidavits provided to the Court, the Court concludes Plaintiffs have met their burden to establish diversity jurisdiction. Thus, Defendants' Motion for Summary Judgment and Motion to Dismiss at Docket Nos. 71 and 73 are **DENIED**.

**SO ORDERED.**

In San Juan, Puerto Rico this 19th day of January, 2016.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge

[5] The Court can exercise supplemental jurisdiction over Vélez's claim because it has established original jurisdiction over Alers' claim. See Exxon Mobile v. Allapattah Services, Inc., 545 U.S. 546, 558-59 (2005).